Next, and I guess last case on the argument calendar, is Valentini v. Group Health Insurance and Ample. All right. Good morning, Mr. Cohen. You've reserved two minutes for rebuttal, so that gives you eight minutes out of the gate. You may proceed. Thank you, your honor. May it please the court. Good morning. My name is Steve Cohen of Paula Cohen, and we represent the Valentini family. The district court erred in finding that GHI and Evercore did not owe a duty of care to Kathleen Valentini after they inserted themselves between Kathleen and her doctor and redirected her medical treatment. Well, I mean, this is a pretty standard situation, right? They're going to cover certain procedures, right? Exactly. And so your view is that every insurance company in those situations is basically making a medical judgment that is potentially putting it at risk for a negligence claim. Not at all, your honor. No. No, there's a framework from the three leading New York State Court of Appeals cases, and they set this framework to say there are many things that are outside, but there are things that are inside. And the three cases, of course, are Summer, Davis, and Landon. And the framework starts with Summer. What was the nature of the service? Is it in the public interest? Were there potential catastrophic effects? Davis says it's got to be limited. What's the cost? How do they comply? And are we being careful not to expand this duty of care? And the third is that is there a system in place, and this is Landon, is there a system in place where it's intended to affect the treatment and possibly the outcome? So there are many things that are not, do not trigger a duty of care in a prior authorization review. The most basic are is it covered by the contract? If it's not covered by the contract, such as my hearing aids or glasses or cosmetic surgery, there's no duty of care ever triggered. Is it a contractual question? But as this court said in Sissio, and Sissio, again, probably should be true, it's good guidance, certainly more than Dicton, certainly good guidance, that the decision is a combined decision where it involves both contract and elements of tort. And that's what happened here with Kathleen Valentini. Wouldn't this be true for any situation where the basis for a non-coverage is it's not medically necessary as defined by the plan? No, Your Honor, because what's unique about situations where it should be a standard, it should be a duty of care, is is it focused on the individual? Here they set up the criteria by which the MRI would be judged. They should follow that criteria, and then they decided to say, no, we're going to intervene between you, the doctor, and you, Kathleen. Look, I've gotten no coverage letters before, and it didn't ever occur to me that this was a second opinion about whether or not I needed to get something that my doctor told me I should get. In a sense, it's the first opinion, because the doctor couldn't do anything. They're saying, they're overruling the doctor. So your view is that if it's not covered by insurance, a person is not permitted to get an MRI? Oh, they could get it, but it doesn't go- Her doctor said you should get an MRI and schedule it, and then reach out to the insurance company to make sure that it was covered. The insurance company comes back and says, this is not covered. It doesn't meet our definition of medical necessity, because you have to follow a couple of things first. It ends up getting appealed in reverse within a matter of weeks. But your view is that that is a medical opinion? They looked at her medical records. They should have also looked at their own insurance records. Because the criteria that they set up for the test for this particular MRI, which is obviously covered by the insurance policy, was that she had to have finished six weeks of physical therapy, over-the-counter painkillers, hot packs, ice packs, what worked. And if you don't respond to that, then you're entitled to the MRI. Not only had she finished that six weeks of physical therapy, they had paid for it. They had previously approved it and paid for it. But what they said was that their records did not show that she failed to approve following a six-week trial of treatment. That's what the letter says. And so it said she should talk to her doctor and also notified her of her right to an appeal, which she did, or her doctor did, and it got reversed. And it got reversed 38 days later, showing that the- Well, counsel, 38 days after what? Because you keep talking about 40 days, five weeks, 38 days. There's a two-day turnaround between the time that an evicare gets the pre-approval request and asks for more info and gets more info, right? Dr. Oliver makes the recommendation on February 4th. They receive the request for pre-approval suggested in the record as February 11th. But even if they received it right around the 4th, they promptly request more info. February 13th, Dr. Oliver gives them more info. On a Saturday, February 16th, they deny it. On the 20th, Dr. Oliver appeals. And on March 7th, 15 calendar days or, like, 10 work days, 11 work days, the MRI is authorized. And this is not brought as an emergency or expedited appeal. So there's a lot of talk in your briefing, which I find a little frustrating, about 38 days, 40 days, five weeks. When, you know, to me, the key places where this was in their court moved fairly efficiently. I'm having trouble. I understand we're talking about duty of care. I'm having trouble figuring out the causation problem as well at this point. We haven't gotten that far, Your Honor. We pled the causation, Your Honor. And we're just trying to get past the motion to dismiss. She gets the ‑‑ she sees Dr. Oliver on February 4th. And on that day, he asks, he says, I want you to have an MRI and contacts the insurance company. They claim, and then we'll come out, if we get beyond this point, if we get the summary judgment, we can debate it then. They claim they don't get it for a week. And then they ask for more information. And when he gives them more information, they turn it around relatively quickly. But the time between February 4th, when she first asks for it, and the time they actually approve it is 38 days by my calculation. And I don't think I'm off by a day. That time, and we, to be able to plead a case of medical malpractice in New York, you have to have a certificate of merit. You have to go to an expert and say, is there actual and proximate causation to allege that there was malpractice, that there was negligence here? And we did that. Her own doctors at Sloan Kettering said to her and to her husband, had you come to us a month sooner, and this is in the pleadings, had you come to us a month sooner, we would have just treated this with chemo. And we know what happened. It was beyond the chemo with the amputations. So as alleged, as we put in the complaint, there was clearly, there was a duty, there was a breach, and there was causation. We know what the injury is. We adequately pled. Is there any court that has ever found such a duty of care in an insurance coverage contract like this one? Not in New York, Your Honor. The closest was this court in Sissio. And Sissio was vacated because it was an ERISA preemption case. But there, the majority and the dissent said this case should move ahead beyond the motion to dismiss stage. Well, but we've got some other cases, not the New York Court of Appeals, but some other New York cases, third department, which have said that this type of relationship, insurance contract, doesn't create a duty of care of the sort that you're talking about, right? I'm referring to Klein versus Empire Blue Cross and Blue Shield. That's correct, except there the beneficiary of the procedure was not the individual, was not the patient. It was always the employer or the- But why does that matter? It makes a great deal of- Well, it's a distinction you can make, but it doesn't seem to be a distinction that the court relied on. Well, it should have relied on, is our point, Your Honor, because the three cases that are, that direct the duty of care framework say, first, you know, it's Summer, and if I may quote, we look to the nature of its services, specifically whether they implicate a public interest, whether the failure to perform the service carefully and competently can have catastrophic consequences. But the kind of, I mean, there it's talking about, you know, a fire would affect people well beyond the contract, right? That's the whole point, the public that would be harmed by a fire. This is a purely, I mean, it's catastrophic as far as Mrs. Valentini is concerned, and I don't want to overlook that, but it's a very different kind of public harm than what's going on in Summer, right? Well, it is, Your Honor, but the purpose of the fire alarm company was to alert the fire department of a potential fire. The purpose of the MRI was to alert the doctor and Mrs. Valentini of potentially catastrophic consequences. Right, but the point of Summer is that this is different than a typical contractual contract because the harms that would flow from the negligent performance of the contract would be felt well beyond the parties to the contract. Potentially. That's not really the case here, right? And that's why in NYU versus Continental Insurance, the New York Court of Appeals noted that courts have been hesitant to expand Summer into the realm of insurance law. And they were quoting Davis, which said it should be limited, it should look at the cost, how hard it would be to comply, and make sure we're not sending a message that this is opening up the gates. But the important thing that was not quoted in NYU was, quote, NYU's fiscal interests were simply not in the same league as the protection of personal safety of citizens. Right, personal safety of citizens caused by a fire that's going to affect people well beyond the contract. And I would argue, Your Honor, that health care and the access to health care is absolutely as important as fire safety. But this is only going to involve the people who are really participants to the contract, right? Yes, it is. Well, I think you've gone over, but you've reserved two minutes of rebuttal. Thank you, Your Honor. Thank you. We'll now hear from Mr. Woolford. Am I pronouncing that right? Yes, sir. Okay. May it please the court. My name is Evans Woolforth from the Givens firm. I represent Appellee's Group Health, Incorporated Emblem Health, Care Corps, National DBA, Evercore. The issue here, I think, is plain that there is, in fact, no duty in tort on these particular facts, and there should be no duty in tort on these particular facts. That's backed up by a robust tradition in the New York courts, admittedly not precisely on point, but very close, as I think that Your Honor's colloquy with my friend Mr. Cohen just established. And finally, the policy implications of extending one to a situation like this are really quite dramatic. We've heard the suggestion that as part of a utilization review, a payor should be examining its own records, notwithstanding what has been submitted to it by a patient's doctor. Issuing by itself, and there's plenty of other ways, but that by itself, inserting an element of uncertainty into the scope of liability that is really quite problematic. And I would point out that a key factor in virtually all of the cases that we've been discussing involve the New York courts paying very careful attention to this element of an unexpected or unpredictable extension of liability, which, Judge Sullivan, I think that your comments, in fact, your questions, in fact, illustrated. The facts in this case, just to bring us back to earth, involve review of a paper record provided by plaintiff's doctor, Dr. Oliver, for a particular purpose, which was whether this particular treatment was going to be covered. No treatment was provided. None was asked for. No medical advice was extended. So far as the complaint discloses, it was, in fact, done consistent with the terms of the plan. The burden was on Dr. Oliver, as the plan documents in the record point out, to submit information substantiating the medical necessity of this claim. And there's been no suggestion that, in fact, Dr. Oliver's initial submission was, in fact, adequate. On the contrary, there was an appeal and a supplemental submission, and upon that supplemental submission, the initial denial was reversed. I mean, that's sort of a merits question, right? I mean, that's not the basis for the dismissal, that the denial was justified. No, no, no. I'm sorry if I misspoke. What I meant to say is that it's not played in the complaint. We're dealing here with the four corners of the complaint, and it's not stated in the complaint that the factual premise of the initial denial was in error, to wit that Dr. Oliver, in fact, did submit a complete and thorough- But I think your argument is that that doesn't matter, ultimately, even- No, I would, yes, that's true. Even if it was a screw-up on the part of GHI or Epicor. The fact is that there's no duty beyond the contract, and so you're not entitled to a tort claim. You might be able to sue to get coverage for what you were entitled to under your policy, but you're not entitled to a tort claim. That's exactly right. My larger point, however, was that where you actually haven't pled a breach of the contract, then surely you can't plead on top of that a breach of some inchoate duty of due care. One of the keys in virtually all the cases that deal with the extension of tort liability in a context, this is some kind of reliance on the part of the putative patient on what was said, and clearly there was none here. On the contrary, the complaint states that Dr. Oliver immediately appealed. The plaintiff surely knew what her prior, less invasive treatment had comprised of, and I think that that certainly puts paid to any medical malpractice claim, but as well shows the lack of a tort-like extension of duty here. There are a number of cases that I'd love to go through, but I would say that there are a few signal cases that stand in such stark contrast to the facts in this case that make the entire proposition here wildly implausible. We have the Kingsley case, and these are tragic cases, make no doubt. There's no doubt. There's the Kingsley case in which the patient had a lung screening for asbestosis. Mass was detected on the lungs and communicated to the employers and the insurers, but not to the patient, and yet there was no liability found in that case. There's the Petrovsky case, a very similar situation. The patient plaintiff had a heart condition which was discovered but not communicated to him. To make our case like those, we would have to have an actual examination of Ms. Valentini that discovered the cancer that was then not communicated to Ms. Valentini, and still the appellate division would not have found liability in Ms. Valentini. The fact is that the- You're suggesting that it would be a different outcome if in reviewing the materials provided by the referring doctor, the folks at Evacor identified what they thought was cancer and didn't communicate that? Yes, I'm saying that if you follow the facts of these cases, that- No, highly counterintuitive. Excuse me, Your Honor. You're saying that would trigger a duty? It would not, not under Kingsley or Petrovsky. It would not, because in those cases they did find dire medical problems, did not communicate them to the patient, used that data, that information, to make the determinations that they were going to make, and the person suffered a catastrophic outcome thereafter. These are grim cases, there's no doubt about it. I come back to something that Judge Case said in concurring in the McNulty matter, is that human compassion and rigorous logic resist the exercise, but the common law courts must look beyond immediate facts and take into account larger principles. Here, specifically mentioning the need to limit the legal consequences of wrong to a controllable degree. My time is dwindling. I would like to just make some points unless Your Honors have further questions for me. I see these cases falling into two buckets. There's the borderland cases where they're talking about tort versus contract. And then there are the medical cases, cases that clearly have a medical component, and the question becomes is the medical component related to treatment or to something else, or is the medical component directed to only the patient or a third party? And those are the issues that the courts seem to be wrestling with. Mr. Cohen, I think, referenced the borderland cases, I'll call them, the tort versus contract, Somer, Davis, Landon. And this is in the service, I think, of his argument coming out of the restatement on the assumption of a duty when one undertakes a service to do it with due care. These cases, particularly the Somer and Landon cases, deal with services, and the restatement expressly incorporates the idea of service. That is to say, if you undertake to drive someone, you're assuming a duty to drive them there carefully, similar with fire alarms. There is no service here. This is not a service being performed, at least not with respect to Ms. Valentini. This was a coverage determination that had to be done for the insurance company. The Landon case was not intended to affect treatment, notwithstanding what was represented. The Landon case was a mistake in a drug test that was communicated to the authorities. I think I've hit my main points. I would say, and Your Honor did touch on this, a point that I was going to make, that the complaint, in fact, does not say that Mrs. Valentini was prevented from getting her MRI. We hear an awful lot, and indeed I think it's the fulcrum of the plaintiff's case, that the insurers here are standing as the gatekeepers, that they're intervening or overruling the doctor. That's simply not stated in the complaint. Again, I recognize it's a 12B6 analysis, but it's what appears there that's the important thing. We hear nothing about financial distress, the idea that Dr. Oliver, as Your Honor put it, was directly overruled. Nothing of that. I see my time is up. If I can be of no further assistance. No, I think that's fine. We'll now hear from Mr. Cullen for rebuttal. Your Honors, three very quick points. As Walter just said, that there was no service. There was indeed a service intent by Evacor and GHI. And it was pleaded in the papers. It goes right to the facts. On their website, they say, the strong evidence supporting our criteria allows us to make appropriate decisions on patients' behalf. And we want to make sure the patient gets the right procedure and a chance to change the outcome and the path. Second, this is a combined case. Just as this Court in Sissio said, and I quote, prior authorization, which is what this is all about, must be treated as a mixed decision because it allegedly involved both an exercise of medical judgment and an element of contract interpretation. These medical decisions have possibly dispositive consequences for the course of treatment that a patient ultimately follows. And the Court concluded, we conclude only that for the purpose of this Rule 12b-6 motion, the plaintiff has alleged more than an adverse benefits decision. Your Honor, the cases that were cited, the patient was not the target, was not the recipient of the examinations. It was the employer. In this case, it was the patient who was to get the treatment, who the test was for. I'm not sure I follow. In the other cases, the employer was going to get the treatment? It was done on the behalf of the employer. Here, the determination is on behalf of the recipient, of Mrs. Valentini. She's the one, and they did step in between. You know, the question of could she have paid for this herself? Why didn't she go? People rely on their insurance to cover what it says it's going to cover. Yeah, and they can sue after the fact, but you're suggesting that this is a second opinion, effectively. And I say it's the first opinion, Your Honor, because they were overruling what the doctor wanted. The first opinion would be the doctor who said, get an MRI. And they're stepping in between. They're saying this is not medically necessary as defined under the plan. And you're saying that that is medical advice that is the equivalent of a second opinion. Yes, it is. You're telling her, don't get an MRI. They are taking on the responsibility for making that medical determination. Is it medically necessary? They should have the accountability of duty of care. Whether they breached it or not, we can decide later on. But we certainly alleged enough in the complaint to show from their own words, they took on this duty to set the criteria for when the MRI was going to be medically necessary. They were supposed to look at her records. They didn't see that she had already finished the six weeks of physical therapy, and thus they owed her. It's not clear from your pleadings that that was disclosed to them in what was submitted when the MRI was requested. We will find out. They submitted that there was this delay. We have not seen half of the things. We have not asked for them. We'll hopefully learn in discovery. Right now, we're just at the motion to dismiss stage. It seems to me you're stating facts beyond what's- In the complaint, Your Honor, it says Dr. Oliver informed them immediately, the same date, the 4th of February. He immediately informed them. It says the 4th of February? I think it took place on the 4th of February, and he immediately requested the prior authorization for the, so immediately, we believe, was literally that day. We ask to reverse, and in the alternative, at the very least, certify the question to the New York State Court of Appeals. All right. Thank you both. We will reserve decision. That concludes our somewhat abbreviated argument today. We do have two other cases on submission, which we will also reserve decision on. Let me ask the clerk, or the deputy in the courtroom, to adjourn the court. Court stands adjourned. Thank you all. Have a nice weekend.